UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | | |
|---|---|---|
| DONNA GAMBREL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 05-415-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| HARTFORD LIFE AND ACCIDENT | ) | **MEMORANDUM OPINION** |
| INSURANCE COMPANY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court for consideration of Plaintiff Donna Gambrel's ("Gambrel") brief on her claim for benefits.  [Record No. 13]  Through this brief, Gambrel has moved the Court to reverse the administrative decision of Hartford Life & Accident Insurance Company ("Hartford") to deny disability benefits to her.  Gambrel most likely did not file a motion for judgment because the scheduling order simply stated that she should file an "opening brief on her claims for benefits."  Likewise, Hartford has not filed a cross-motion.  However, at the end of its response brief, Hartford asks that this Court affirm the administrative decision.[1] [Record No. 19] The Court will construe Gambrel's and Hartford's briefs as motions for judgment.

---

[1]     The scheduling order also allowed Gambrel to file a reply brief, which was timely filed on March 13, 2006 [Record No. 20].

-1-

Gambrel contends that Hartford's decision not to award her benefits was arbitrary and capricious. However, after reviewing the materials filed by the parties, the Court cannot agree with this contention. Accordingly, the Court will deny Gambrel's motion and will grant Hartford's motion for judgment.

## I.     BACKGROUND

At times relevant to this action, Gambrel was a customer service representative at LG&E Energy Corp. ("LG&E"). On or about September 17, 2001, Gambrel applied for long-term disability benefits based on her mental status under LG&E's employee benefit plan (the "Plan"). The Plan is operated by LG&E and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* In her application for benefits, Gambrel described the physical manifestations of her mental illness giving rise to her claim for benefits. She indicated that she was suffering from the following:

> Chest pains, smothering from panic attacks – back and muscle pain while in bathroom. 1st stomach pain with chronic diarrhea – chills and hot flashes. Also, have nightmares at night and wake up screaming. Very depressed, sad and extremely nervous.

[*See* Administrative Transcript Record ("ATR"), p. 281] On the application, Dr. Rosa Riggs, Gambrel's attending physician, provided a primary diagnosis of "Major Depression, GAD = PA" and a secondary diagnosis of "Adjustment Disorder." [ATR, p. 285] Dr. Riggs described Gambrel's subjective symptoms as "[f]eels worthless, useless, hopeless, gets fearful, shakes, heart pounds and races, cries, indigestion and discomfort in abdomen. Worries." [ATR, p. 285] Dr. Riggs provided tests results from the Hamilton Anxiety Test

-2-

and Hamilton Depression Test, which indicated that Gambrel suffered from severe anxiety and depression. When asked to provide the findings of physical examinations, Dr. Riggs stated that Gambrel "had a panic attack in my office." [ATR, p. 285]

After reviewing Gambrel's application for benefits, Hartford determined that she was entitled to benefits for being Totally Disabled due to Mental Illness, namely Major Depression. [ATR, p. 044] At that time, she was informed that her benefits would commence on October 30, 2002, and that, absent hospitalization, no disability benefits would be payable after October 29, 2004. On October 8, 2004, Hartford notified Gambrel that her benefits were set to expire on October 29, 2004. [ATR, p. 041]

Gambrel appealed the decision on October 14, 2004. [ATR, p. 143] In the appeal, she claimed for the first time that she was disabled by physical problems, such as fibromyalgia, a bulging disc, and a fractured vertebrae. According to the policy, Gambrel was not entitled to receive benefits after October 29, 2004, if these ailments were physical manifestations of the mental disorder that had previously entitled her to long-term disability benefits. [ATR, p. 023] Thus, Hartford determined that the issue on appeal was whether Gambrel suffered from a physical ailment, unrelated to her mental condition, that prevented her from performing the essential duties of "any occupation" for which she was qualified by education, training, or experience.

At the time she filed her appeal, Gambrel submitted additional medical evidence. However, Hartford advised her that the information was insufficient to allow it to assess her claim. On November 11, 2004, Hartford again advised Gambrel of the need to submit

-3-

additional medical reports and that a failure to submit such information would result in a

decision based on the medical evidence of record.  Hartford requested that the information

be provided by December 29, 2004. [ATR, p. 039]  On November 15, 2004, Gambrel spoke

with Hartford Examiner, Kele Alston.  At that time, Gambrel was advised of the following:

> [Claimant called in] because she did not understand [letter received] from
> appeal specialist.  [Advised claimant] appeal specialist is [advising] that we
> need her to submit any [additional medical records' for [review] otherwise we
> will [review] with what we already have.  [Claimant advised] that she
> [included] the names of all 7 [attending physicians] and all the [medications]
> they have her taking in a [letter].  [Advised claimant] we need physical
> [information] on her condition from these [attending physicians] to consider
> on [claim] and she would need to submit this [additional information] if she
> wants it to be considered in the appeal [review].  [Claimant advised] she will
> contact [attending physicians] and have them mail in [overnight package] to
> us.

[ATR, p. 057]  Gambrel again called Hartford later that same day and spoke with Examiner

Vernessa Melton.  Melton's notes from the call reflect that Gambrel was informed of the

following:

> [Advised claimant that] she must obtain any [additional medical information
> that] she wants [reviewed with] appeal and submit to [Hartford Insurance
> Group].

[ATR, p. 057]  Gambrel submitted additional records on November 19, 2004.

Subsequently, Hartford requested that Dr. Gerry Smith, a certified independent

medical examiner, review the medical records to determine whether they substantiated

Gambrel's claim of physical inability to perform "any occupation."  Ultimately, Dr. Smith

concluded that:

-4-

There is no objective findings that would indicate Ms. Gambrel could not perform work activities within the sedentary work level. I believe she also is physically capable of performing many of the activities within a light work level as defined by the Dictionary of Occupational Titles."

[ATR, p. 095]

After reviewing Dr. Smith's findings from the Independent Medical Review and all of the evidence submitted by Gambrel, Hartford denied Gambrel's appeal. Hartford informed Gambrel in a January 18, 2005, letter that:

The medical evidence does not substantiate any physical inability to perform any occupation. There is no objective findings [sic] that would indicate you could not perform work activities within the sedentary work level as with most patients with fibromyalgia, that during a full workday they should be given the opportunity to change positions every two hours.

[ATR, p. 037]  This civil action followed.

## II.    LEGAL STANDARD

### A.    Standard of Review

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989), the Supreme Court set forth two standards of review for ERISA benefit determinations. When the retirement plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, an abuse of discretion standard applies.  *Id*. at 111.  In all other cases, the review is *de novo*. *Id*. at 115.

In this case, Hartford had complete discretionary authority to construe the terms of the plan, as it provided that "[Hartford has] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance

-5-

Policy." [ATR, p. 27]  Therefore, the abuse of discretion standard will apply.[2]  The abuse of

discretion standard requires that Hartford's "decision be upheld if it is the result of a

deliberate, principled reasoning process and if it is supported by substantial evidence."

*Baker v. United Mine Workers of Am. Health and Retirement Funds*,  929 F.2d 1140, 1144

(6th Cir. 1991) (per curiam).   "[W]hen it is possible to offer a reasoned explanation, based

on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."

*University Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000)

(quotation and citation omitted).

Gambrel argues that, inasmuch as Hartford was the decision-maker as well as the

payor of the claim, the arbitrary and capricious standard should be curtailed in this case.

When a potential conflict of interest exists, the arbitrary and capricious standard still applies,

however the analysis is "shaped by the circumstances of the inherent conflict of interest."

*Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991).   Absent some evidence

from Gambrel that Hartford acted improperly, there is no reason to accord less weight to the

opinions of the doctors, nor is there any need to alter the Court's review of Hartford's

decision.  *Peruzzi*, 137 F.3d at 433; *Cochran v. Trans-General Life Ins. Co.*, 12 Fed. Appx.

277, 281 (6th Cir. 2001) ("mere allegations of the existence of a structural conflict of interest

---

[2]        Gambrel and Hartford agree that the arbitrary and capricious standard of review applies in this case.

are not enough; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits"), *cert. denied*, 534 U.S. 887 (2001).[3]

In this case, Gambrel has not offered a scintilla of evidence demonstrating that Hartford or the doctors acted improperly. She merely seeks to create suspicion through innuendo and suggestion. Under Gambrel's logic, a self-funded insurance plan could never rightfully deny an application for disability benefits. Clearly, in allowing for such plans and allowing for disability determinations to be made by plan administrators, Congress dismissed any suggestion that ERISA determinations are inherently improper due to the mere existence of a conflict of interest. While the potential for a conflict of interest is a factor to be considered, but it does not deserve much weight given the lack of any evidence demonstrating impropriety by Hartford or the doctors.

As the Supreme Court noted in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'" *Nord*, 538 U.S. at 832. There is no presumption that a physician hired by the plan administrators is necessarily less objective than a treating physician. Likewise, there is no presumption that a self-funded plan is unable to conduct a fair and balanced review of an insured's claim.

---

[3]     Other circuits have adopted a heightened version of the "arbitrary and capricious" standard of review when a conflict of interest exists. *See Levinson v. Reliance Std. Life Ins. Co.*, 243 F.3d 1321, 1326 (11th Cir. 2001); *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 378-79 (3rd Cir. 2000); *Barnhart v. UNUM Life Ins. Co.*, 179 F.3d 583, 587 (8th Cir. 1999). To date, the Sixth Circuit has not adopted such a standard of review, apart from its instruction in *Peruzzi* that "the conflict of interest inherent in self-funded plans does not alter the standard of review, but should be taken into account as a factor in determining whether the decision was arbitrary and capricious." *Peruzzi*, 137 F.3d at 433 (citation and quotation omitted).

**B.      Scope of Analysis**

The scope of analysis employed in reviewing motions for judgment in ERISA actions in the Sixth Circuit is neither that of a motion to dismiss nor a motion for summary judgment, rather, it falls somewhere in between the two.  *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).  The *Wilkins* court suggested the following procedures for adjudicating an ERISA action:

> 1. As to the merits of the action, the district court should conduct a *de novo* review[4] based solely upon the administrative record, and render findings of fact and conclusions of law accordingly.  The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.
>
> 2. The district court may consider evidence outside the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part.  This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.
>
> 3. For the reasons set forth above, the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition.

*Id*.

Here, there is a dispute regarding the scope of the evidence relevant to the pending motions.  In support of her motion, Gambrel has submitted additional records which she contends Hartford failed to consider in addressing her claim for benefits.  Hartford argues

---

[4]      In *Wilkins*, the review was *de novo* because the plan did not give the plan administrator discretionary authority to interpret the terms of the plan. *Id.* at 613, n.3.

that these records should not be considered by the Court because Gambrel failed to submit them for review at the administrative level.  According to Hartford, it was Gambrel's obligation to submit any and all medical records she believed were necessary for consideration of her claim and the Court cannot now consider medical information that was never submitted to it when it made its determination.

Based on the language of the Policy, it was Gambrel's responsibility to submit to Hartford proof sufficient to establish disability.  The Policy required Gambrel to submit "Proof of Loss" which may include, but is not limited to, the following:

1.   documentation of:

    a)   the date your Disability began;
    b)   the cause of your Disability;
    c)   the prognosis of your Disability;
    d)   your Earnings or income, including but not limited to copies of your filed and signed federal and state tax returns; and
    e)   evidence that you are under the Regular Care of a Physician;

2.   Any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;

[ATR, p. 025, 026]  The Policy further provides that the obligation to supply this information is continuing and that a failure to submit such information may result in termination of benefits.  [ATR, p. 026, 022]

In the present case, Gambrel was repeatedly advised of her obligation to submit proof of her physical disability.  The record reflects that Hartford provided Gambrel with ample notice and opportunity to provide any and all medical records that she believed Hartford

needed to resolve her appeal.  Gambrel cannot now rely on medical information never submitted to Hartford.  The Court is confined to reviewing only those materials known to the administrator at the time the decision was made.  *See Univ. Hosps. of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 845 n. 2 (6th Cir. 2000); *Peruzzi v. Summa Med. Plan,* 137 F.3d 431, 433-34 (6th Cir. 1998).  Thus, the Court will rely on the administrative record that was before Hartford when it made its determination.

The Policy states that only "totally disabled" employees are entitled to long-term disability benefits.  [Tr., p. 18] The Policy defines "totally disabled" as follows:

**Total Disability or Totally Disabled** means that:

(1)    during the Elimination Period; and

(2)    for the next 24 months you are prevented by:

        a)    accidental bodily injury;
        b)    sickness;
        c)    Mental Illness;
        d)    Substance Abuse; or
        e)    pregnancy.

from performing the Essential Duties of Your Occupation, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

After that, you must be so prevented from performing the Essential Duties of Any Occupation for which you are qualified by education, training, or experience.

[ATR, p. 018 (emphasis in original)]  Hartford initially determined that Gambrel was unable to perform the essential duties of her occupation due to Mental Illness.  Based on this finding, she was deemed "totally disabled" and was awarded benefits.  However, those benefits, in

-10-

accordance with the policy, were limited to a period of 24 months.  To be eligible for additional benefits, Gambrel was required to present medical evidence establishing that she suffered from a disability other than Mental Illness and, therefore, was unable to perform the essential duties of "any occupation" for which she was qualified by education, training or experience.  The Policy defines "Any Occupation" as follows:

> an occupation:
>
> 1.     for which you are qualified by education, training or experience; and
>
> 2.     That has an earning potential greater than an amount equal to the produce of your Indexed Pre-disability Earnings and the Benefits Percentage.

[ATR, p. 015] Through her appeal, Gambrel alleged that she was "totally disabled" from performing "any occupation" due to a physical problem.  In a letter attached to her appeal, Gambrel noted that "[m]y appeal is based on physical problems, not mental." [ATR, p. 143] Specifically, she noted that she suffered from a fractured vertebrae (T11), a bulging disc and fibromyalgia.  Having examined the medical evidence of record, the Court finds that Hartford's decision that Gambrel was not totally disabled is supported by significant evidence in the record.

### T11 Fracture

As noted by Hartford, the Administrative Record does not contain a radiologist's report documenting a fracture at T11.  Moreover, only one physician, Dr. Rosa Riggs, placed work restrictions upon Gambrel based on this condition.  In an August 11, 2004, to Dr. Martha Combs-Woolum, Dr. Riggs states that "Gambrel is unable to return to work because

of her pain and her emotional state." [ATR, p. 104]  In support of this recommendation, Dr. Riggs merely makes the conclusory statement that Gambrel suffers from " a fractured T11 and a bulging disc at L4-L5 and [f]ibromyalgia." [ATR, p. 104]  Dr. Riggs, however, did not indicate any physical limitations or impairments caused by these conditions.  Hartford's medical examiner (Dr. Smith) reviewed Dr. Riggs' opinions as to Gambrel's ability to return to work and concluded that her opinions were largely based on Gambrel's "emotional state."

It is apparent that Hartford considered – and ultimately rejected – Dr. Riggs' conclusions regarding Gambrel's capacity to perform work.  *See Nord*, 538 U.S. 822 (rejecting the notion that the opinions of treating physicians are inherently more reliable than those of non-treating physicians).  Hartford had the discretion to make such a determination and the record demonstrates that there was a reasonable basis to do so given that Dr. Riggs' opinion conflicted with the substantial evidence or record.

Aside from the letter from Dr. Riggs, there is no doctor's report which places any limitations or restrictions upon Gambrel's activities or capacity to perform work due to a T11 fracture.  After conducting a review of the medical evidence, Dr. Smith noted that "[i]t would be extremely rare for a T11 fracture to have persistent symptoms months or years after it has occurred." [ATR, p. 093-094]  The Court finds that there is sufficient evidence in the record to support Hartford's determination that Gambrel was not entitled to an award of benefits based on this condition.

**Fibromyalgia**

-12-

Case: 6:05-cv-00415-DCR   Doc #: 21   Filed: 03/22/06   Page: 13 of 16 - Page ID#: 116

The records contained in the administrative transcript reflect that several doctors diagnosed Gambrel with fibromyalgia. However, aside from Dr. Riggs, none of these physicians placed any restrictions on Gambrel that would render her incapable of performing "any occupation" as defined by the Hartford policy. Dr. Scott Mirani performed a "follow-up" examination of Gambrel on October 20, 2003. In his report, he noted that Gambrel was last seen in August of 2003 for management of fibromyalgia. He indicated that her "tender points [were] still quite evident." [ATR, p. 172] He recommended that Gambrel treat her condition with medication and a home exercise program.

On December 16, 2003, Dr. Martha Combs-Woolum, Gambrel's treating physician, diagnosed her with fibromyalgia. At that time, she recommended medication for treatment. Having examined the evidence of record, the Court finds that there was significant evidence to support Hartford's decision that the diagnosis of fibromyalgia does not support Gambrel's claim for benefits.

### Bulging Disc

Gambrel had a MRI on January 28, 2003, which showed "minimal central bulging" at L4-5 and L5-S1 and "very minimal impingement" of the thecal sac between L4-5. [ATR, p. 145] Dr. Mirani noted, after conducting his examination, that Gambrel had some low back pain with a L4-L5 disc bulge. However, he indicated that there were no signs of neural impingement. Although the evidence of record demonstrates that Gambrel does suffer from a bulging disc, she has failed to identify a single doctor, with the exception of Dr. Riggs, who concluded that this condition renders her "totally disabled" as defined by the policy. There

-13-

was significant evidence to support Hartford's decision that the bulging disc does not preclude Gambrel from performing "any occupation" for which she is suited.

### Independent Medical Review

Relying on the Sixth Circuit's decision in *Calvert v. Firstar Financial, Inc.*, 409 F.3d 286 (6th Cir. 2005), Gambrel complains that Hartford's decision to rely on a file review instead of a physical exam raises questions about the accuracy of the benefits determination. Hartford selected Dr. Gerry Smith to perform a review of Gambrel's medical records prior to making the disability determination. As pointed out by Hartford, the reliance on a file review does not, standing alone, require the conclusion that it acted improperly. Rather, it is simply a factor for the Court to consider in assessing whether Hartford acted in an arbitrary and capricious fashion. *Calvert*, 409 F.3d at 295.

Dr. Smith performed a thorough review of each of the medical records contained the administrative file. In his nine-page report, he sets out the records he reviewed, noted the relevant portions thereof, and listed those portions that he relied upon in reaching his conclusions. Dr. Smith found limited documentation of physical findings and no documented objective findings indicating a physical impairment that would render Gambrel unable to perform the essential duties of "any occupation." Dr. Smith acknowledged that Dr. Riggs, one of Gambrel's treating physician, found that she was unable return to work "because of her pain and her emotional state." [ATR, p. 104] However, after reviewing Dr. Riggs' records, Dr. Smith concluded that "the records reflect the Dr. Rigg's opinion is based primarily on the psychiatric diagnosis." [ATR, p. 095] Gambrel was considered totally

-14-

disabled due to her mental illness inasmuch as she was unable to perform her occupation. However, at the expiration of the 24 month period, Gambrel was required to present additional medical evidence demonstrating that she suffered from a physical impairment that prevented her from performing "any occupation."  After a review of the records, Dr. Smith concluded that:

> [t]here is no objective findings that would indicate Ms. Gambrel could not perform work activities within the sedentary work level.  I believe she also is physically capable of performing many activities within a light work level as defined by the Dictionary of Occupational Titles.

[ATR, p. 095]  Dr. Smith's conclusions coincide with the verifiable objective medical evidence of record.  The medical records submitted by Gambrel contain no information to support the conclusion that she was totally disabled from "any occupation" as a result of a physical condition.

## III.   CONCLUSION

The record does not support Gambrel's contention that Hartford's determination was arbitrary and capricious.  There was substantial evidence to support the decision and it was well within the range of reasonableness required of ERISA plan administrators. Accordingly, for the reasons above, it is **ORDERED** as follows:

1.     Gambrel's brief [Record No. 13], construed by the Court as a motion for judgment, is **DENIED**;

2.     Hartford's brief [Record No. 19], construed by the Court as a motion for judgment, is **GRANTED**; and

-15-

3.      Hartford's decision will be **AFFIRMED** by separate judgment entered this date.

This 22nd day of March, 2006.



Signed By:

*Danny C. Reeves*

United States District Judge